

1     UNITED STATES DISTRICT COURT

2     WESTERN DISTRICT OF LOUISIANA

3     SHREVEPORT DIVISION

4

5   UNITED STATES OF AMERICA          )
                                       )     Criminal Action
    VS.                                )     No. 5:18-CR-0232-01
6                                      )
    CARLOS A. SPANN                    )
7   _____ )

8

9               DETENTION HEARING
         OFFICIAL TRANSCRIPT OF PROCEEDINGS
10    BEFORE THE HONORABLE MARK L. HORNSBY
          UNITED STATES MAGISTRATE JUDGE
11            SEPTEMBER 11, 2018
             SHREVEPORT, LOUISIANA

12

13   **FOR THE GOVERNMENT:**
          AUSA Tiffany E. Fields
14        U.S. Attorney's Office
          300 Fannin Street, Suite 3201
15        Shreveport, Louisiana  71101-3068

16   **FOR THE DEFENDANT:**
          AFPD Betty Lee Marak
17        Federal Public Defender's Office
          300 Fannin Street, Suite 2199
18        Shreveport, Louisiana  71101

19

20

21

     Produced by mechanical stenography, transcript produced by
22   computer.

23   _____
              **MARIE M. RUNYON, RMR, CRR**
24          FEDERAL OFFICIAL COURT REPORTER
             300 FANNIN STREET, ROOM 4212
25           SHREVEPORT, LOUISIANA  71101
                  (318) 934-4756

1       (Court called to order with the defendant

2       present at 2:23 p.m.)

3            THE COURT:  Thank you.  Be seated, please.

4       The next matter is United States v. Carlos A. Spann.  It

5  is 18-CR-232.  Mr. Spann has been indicted on charges related

6  to conspiracy to commit bank and wire fraud.  Ms. Fields is

7  here for the government, and Ms. Marak is present with

8  Mr. Spann.  We're here for the detention hearing.

9       The pretrial services report has been prepared by

10 Probation, as is done in all of our cases, and that report has

11 been provided to Ms. Fields and Ms. Marak.

12      We have already -- at the last court appearance, we took

13 care of Mr. Spann's arraignment.  We've got his not guilty plea

14 entered.  We also have a date for motions and for a status

15 conference.

16      Ms. Marak, Ms. Fields related in the conference room that

17 perhaps the discovery might be a little bit more voluminous

18 than she thought at first, and if you need more time for motion

19 practice, all you'll have to do is ask at the conference.

20           MS. MARAK:  Yes, sir.

21           THE COURT:  Let's see.  Ms. Fields, how many

22 witnesses do you have for the detention hearing?

23           MS. FIELDS:  Your Honor, just one:  Special Agent

24 Darren Craft.

25           THE COURT:  All right.  Agent Craft, would you come

1    up and be sworn, please.

2        (Witness sworn.)

3            THE COURT:  Have a seat, sir.

4                        DIRECT EXAMINATION

5    BY MS. FIELDS:

6    Q.    Agent Craft, could you please spell your last name for

7    the court recording.

8    A.    C-r-a-f-t.

9    Q.    Thank you.  And how are you employed?

10   A.    I'm a senior special agent with the United States Secret

11   Service.

12   Q.    How long have you been with the Secret Service?

13   A.    Nineteen years.

14   Q.    And what are some of your duties?

15   A.    Secret Service is dual-fold.  Obviously, we do

16   protection; and on the investigative side, we investigate most

17   white collar crimes:  credit cards, counterfeit money,

18   counterfeit checks, et cetera.

19   Q.    And through your duties as a special agent with the

20   Secret Service, have you become familiar with Carlos Spann?

21   A.    I have.

22   Q.    And how are you familiar with Mr. Spann?

23   A.    Mr. Spann has been dealt with by previous agents with the

24   United States Secret Service and then also this case.

25   Q.    And in reference to "this case," are you referring to a

1    case involving Tower Loan?

2    A.    Yes.

3    Q.    And can you tell the Court a little bit about how this

4    case developed and how you became aware of Tower Loan.

5    A.    Tower Loan contacted our Baton Rouge office, Secret

6    Service Baton Rouge office, in about the third week of November

7    2017 asking for assistance in a counterfeit check scheme that

8    had plagued their organization for a couple of months.  They

9    informed us -- at that time, it was approximately a little over

10   110 counterfeit checks that were passed throughout the state of

11   Louisiana in October and November of 2017 causing well over

12   $300,000 in loss.

13   Q.    And where all were these checks passed?

14   A.    In the state of Louisiana, south Louisiana, north

15   Louisiana.

16   Q.    Were they passed at banks or somewhere else?

17   A.    They were passed at Regions Banks, yes.

18   Q.    And were there any Tower Loan checks passed at Walmarts?

19   A.    There was checks that had the emblem of Tower Loan on it,

20   yes.

21   Q.    And I believe I've already given you a copy of the

22   exhibits.  If I could focus your attention to Government's

23   Exhibit 1.

24   A.    Yes.

25   Q.    Do you recognize this document?

1    A.    I do.

2    Q.    And what is this?

3    A.    This is a Tower Loan counterfeit check that was passed in

4    Longview, Texas.

5    Q.    And on pages 2 and 3 of Exhibit 1?

6    A.    Yes.

7    Q.    What are those documents?

8    A.    These are still shots of the individual that was

9    responsible for the passing of the counterfeit Tower Loan

10   check.

11   Q.    And where were these still images acquired from?

12   A.    They were acquired from Gregory Mitchell, which is a

13   global investigator with Walmart.  He provided the still shots

14   from the actual Walmart in Longview, Texas.

15   Q.    And a copy of the Tower Loan check, where was that

16   acquired from?

17   A.    That was also acquired from Tower Loan.  They forwarded

18   that check to me.

19         This check actually was passed several months after the

20   October/November incidents, so Josh Jenkins, the internal

21   auditor with Tower Loan, forwarded this check to me.

22            MS. FIELDS:  Your Honor, I move to admit Government's

23   Exhibit 1.

24            MS. MARAK:  No objection.

25            THE COURT:  Admitted.

1          MS. FIELDS:  And, Your Honor, if I may inquire, I

2    believe a copy of the paper exhibits have been provided to the

3    Court?

4          THE COURT:  I have it.

5          MS. FIELDS:  I believe I can avoid using the ELMO if

6    we can just focus on the actual paper exhibits we have a copy

7    of.  I believe everyone has a copy.

8    BY MS. FIELDS:

9    Q.   Agent Craft, page 1 of Exhibit 1, who is that check made

10   payable to?

11   A.   Adam Darnell.

12   Q.   And on pages 2 and 3, who actually passed this check?

13   A.   Carlos Spann.

14   Q.   Did you obtain photocopies of other counterfeit checks?

15   A.   Yes.

16   Q.   And how did you acquire those?

17   A.   The actual copies of the checks themselves were forwarded

18   to me from Lisa Nesbitt, corporate security with Regions Bank.

19   Q.   And who passed those checks?

20   A.   Those checks, we determined, were passed by Phelix

21   Williams, Anthony Johnson, and one unknown female, and then

22   also an attempt by a King Copeland.

23          MS. MARAK:  I'm sorry.  By who?

24          THE WITNESS:  King Copeland.

25          MS. MARAK:  Oh.

BY MS. FIELDS:

Q.    How did you determine that Phelix Williams had passed counterfeit checks belonging to Tower Loan?

A.    As part of the checks that were forwarded to me from Regions Bank, south Louisiana banks were able to keep 40 checks, approximately 40 genuine checks, so those were forwarded up to me. I turned them over to Detective Sarah Brown with Shreveport Police Department that was assisting in this case; and, in turn, she turned that over to CSI of Shreveport Police Department. They were able to identify -- off of those 40 checks, they were able to identify ten prints on those checks.

Q.    Ten fingerprints?

A.    Ten fingerprints, yes.

Q.    And those fingerprints were analyzed?

A.    They were.

Q.    And it was determined that those prints belonged to Phelix Williams?

A.    That's correct.

Q.    And where were those checks cashed, again?

A.    In south Louisiana at the Regions Banks.

Q.    At Regions Bank. All right.

      Was an arrest warrant obtained for Mr. Williams?

A.    Yes.

Q.    And was he arrested?

```
1    A.    He was.

2    Q.    Did he have a cell phone on him at the time of his

3    arrest?

4    A.    He didn't have it on him at the time of his arrest.

5    Q.    Was there a search warrant procured for his cell phone?

6    A.    Yes.

7    Q.    And was that cell phone analyzed?

8    A.    Yes.

9    Q.    Was there anything notable?

10   A.    As part of the, what we call the phone dump, we did see

11   some text messages on the phone between Phelix and an

12   individual that he referred to as "Unk" in there.  In those

13   text messages, there was conversations about Certegy, Walmart,

14   Super 1 Foods.  Also within those text messages, different

15   social security numbers, different names -- we noticed that.

16   And then, also, in the photos on the phone, we noticed a

17   Tri-State Drainage and Sewerage check in the photos.

18   Q.    Now, you mentioned that there were conversations between

19   Mr. Williams and someone that Mr. Williams referred to as

20   "Unk."  Does Carlos Spann have street names that you're aware

21   of?

22   A.    He does.

23   Q.    And what are those?

24   A.    A couple of them that I know would be "Omega" and "Unk."

25            THE COURT:  What are they, again, please?
```

1          THE WITNESS:  "Omega" and "Unk."

2          THE COURT:  All right.

3    BY MS. FIELDS:

4    Q.    Now, you said that Detective Doug Smith received some

5    information from the phone regarding a Tri-State Sewerage

6    check.  What did he do with that information?

7    A.    Since on the phone that there was talk about Certegy,

8    Walmart -- I mean, it's not unusual for a large percentage of

9    counterfeit checks to be passed at Walmart; so, first of all,

10   what Detective Smith did is he looked at the routing number and

11   the account number on that specific check, was able to

12   determine that the routing number came back to Chase Bank.

13         Now he's got the routing number.  So he reached out to

14   investigators with Chase Bank and they informed him that the

15   actual account number did not come back to a Tri-State

16   Sewerage, in fact, it came back to a United States Postal

17   Service account, and it was a legitimate, open account.

18         With that information, Detective Smith contacted Chris

19   Jacobson, which is an investigator with Certegy out of

20   St. Petersburg, Florida, and requested that Certegy do a check

21   of any of these checks that were passed at Walmart showing the

22   account number and the routing number with the "Tri-State

23   Sewerage and Drainage" on it.

24   Q.    And were there checks that were passed at Walmart with

25   that account number on them?

1    A.    Yes.

2    Q.    And I believe you have a copy of what's been premarked

3    Government's Exhibit 2, pages 1 through 8.  Do you recognize

4    these documents?

5    A.    I do.

6    Q.    And what are these?

7    A.    These are counterfeit Tower Loan checks, except this

8    would be the routing number for Chase and then also the United

9    States Postal Service account number.

10   Q.    And who is this check made out to?

11   A.    Lance Willis.

12   Q.    I'd like to --

13        MS. FIELDS:  Your Honor, I'd like to move to admit

14   Government's Exhibit 2.

15        MS. MARAK:  No objection.

16        THE COURT:  It's admitted.

17   BY MS. FIELDS:

18   Q.    Agent Craft, I'd like to direct your attention to page 8.

19   A.    Okay.

20   Q.    Can you tell us what this is.

21   A.    This is a printout that I performed on Louisiana

22   Thinkstream, which is a search engine for law enforcement in

23   the state.

24   Q.    And towards the bottom or, I guess, middle of the

25   left-hand side, there's a photograph of Mr. Willis?

1    A.    Yes.

2    Q.    And further down on the page, it lists his height,

3    weight, race.  Can you describe Mr. Willis to the Court,

4    please.

5    A.    White male.  It shows six-one, 250 pounds.

6    Q.    Agent Craft, did you acquire a surveillance video from

7    Walmart in Monroe?

8    A.    I did.

9    Q.    Where this check was cashed?

10   A.    I did.

11   Q.    And have you reviewed that surveillance video?

12   A.    I have.

13          MS. FIELDS:  Your Honor, I move to admit Government's

14   Exhibit 3.

15          MS. MARAK:  No objection.

16          THE COURT:  It's admitted.

17          MS. FIELDS:  Your Honor, I'd like to direct the

18   Court's attention to approximately 18:45:25 on that video.

19          THE COURT:  All right.

20          MS. FIELDS:  And, Your Honor, I think Ms. Cassidy is

21   running that video for me.  If we could have the screen,

22   please.

23       (Video played and paused.)

24   BY MS. FIELDS:

25   Q.    In the bottom right-hand corner, who do we see there?

1   A.    Mr. Spann.

2           MS. FIELDS:  You can continue to play for a moment.

3       (Video playing.)

4   BY MS. FIELDS:

5   Q.    And towards the top left-hand corner of the screen, what

6   is Mr. Spann handing to the clerk here?

7   A.    Mr. Spann will hand the clerk a check and then an ID to

8   go along with it.

9           MS. FIELDS:  You can pause it, Ms. Cassidy.  Thank

10  you.

11      (Video stopped.)

12  BY MS. FIELDS:

13  Q.    Agent Craft, the check that was handed to the clerk in

14  this video, is that the same check that we see on Government's

15  Exhibit 2, page 1?

16  A.    It is.

17          MS. FIELDS:  I'd like to direct the Court's attention

18  to the second video at approximately 18:51:07.

19      (Video played.)

20  BY MS. FIELDS:

21  Q.    And what are we seeing in this video?

22  A.    This would be an -- exit doors of Walmart.

23  Q.    And on the right-hand side, who do we see exiting?

24  A.    Mr. Spann.

25  Q.    Mr. Spann cashed the check made payable to Lance Willis

1    at Walmart in Monroe?

2    A.    He did.

3    Q.    Is that the only check that Mr. Spann cashed?

4    A.    No.

5    Q.    Where else did he cash a check, a Tower Loan check with

6    the U.S. Postal Service account number on it?

7    A.    He also cashed a check at the Walmart in Ruston.

8                 THE COURT:  In where?

9                 THE WITNESS:  Ruston.

10   BY MS. FIELDS:

11   Q.    Agent Craft, you have a copy of Government's Exhibit 4?

12   A.    I do.

13   Q.    And what are these documents in Exhibit 4, pages 1 and 2?

14   A.    It would be the same thing, another counterfeit check

15   showing "Tower Loan," yet coming back to Chase Bank, for the

16   United States Postal Service account.

17                 MS. FIELDS:  Your Honor, I move to admit Government's

18   Exhibit 4.

19                 MS. MARAK:  No objection.

20                 THE COURT:  It's admitted.

21   BY MS. FIELDS:

22   Q.    This particular check, who is it made payable to?

23   A.    Tony Ashley.

24   Q.    And who passed this check?

25   A.    Mr. Spann.

1    Q.    And how did you determine that Mr. Spann passed this

2    check?

3    A.    We were able to pull video surveillance also of that

4    transaction.

5    Q.    Were these the only checks with the Postal Service bank

6    account number on them that were passed fraudulently?

7    A.    No.

8    Q.    What other checks were fraudulently passed with the

9    Postal Service account number on them?

10   A.    We were able to determine that Mr. Williams, Phelix

11   Williams, also was responsible for passing the Postal Service

12   checks.

13   Q.    And was there a distinction between the checks that were

14   passed by Mr. Spann and the checks that were passed by

15   Mr. Williams?

16   A.    The only distinction would be Mr. Spann actually passed

17   two checks showing "Tower Loan" on it, Mr. Williams passed

18   checks showing the "Tri-State Drainage and Sewerage."

19          THE COURT:  So on Government Exhibit 4, the Tower

20   Loan check, that routing number and account number goes to the

21   Postal Service?

22          THE WITNESS:  That's correct.

23          THE COURT:  So it wasn't being debited to Tower

24   Loan's account, it was being paid for by the Postal Service?

25          THE WITNESS:  It actually would come out of the

1  United States Postal Service account until charged back to

2  Walmart.

3  BY MS. FIELDS:

4  Q.    Agent Craft, were you able to determine if these checks

5  were charged back to Walmart?

6  A.    I was.

7  Q.    And how were you able to make that determination?

8  A.    Through -- Mr. Jacobson with Certegy was able to

9  determine that the actual amounts were charged back to Walmart.

10 Q.    And you have a copy of Government's Exhibit 5 there with

11 you?

12 A.    I do.

13 Q.    What is this document?

14 A.    This is from Certegy.  Chris Jacobson provided that to

15 me, and in it, it shows each transaction of the two checks in

16 question and also shows where the checks cleared out in their

17 Certegy system or where the authorization took place.  It

18 showed that it cleared state lines.

19 Q.    And the check for $563.82, where was it cleared from?

20 A.    I believe that would have been St. Petersburg, Florida.

21 Q.    And the check for $547.68, where was it cleared?

22 A.    Chicago, Illinois.

23 Q.    And how did you obtain a copy of Government's Exhibit 5?

24 A.    From Chris Jacobson with Certegy.

25        MS. FIELDS:  Your Honor, I move to admit Government's

1   Exhibit 5.

2              MS. MARAK:  No objection.

3              THE COURT:  It's admitted.

4   BY MS. FIELDS:

5   Q.    Agent Craft, are you familiar with Mr. Spann's criminal

6   history?

7   A.    Yes, I am.

8   Q.    And how are you familiar with that?

9   A.    Obviously, I've never dealt with Mr. Spann.  This is the

10  first time that I have.  But I do know that he's of record with

11  the United States Secret Service going all the way back to

12  1999.  And then, also, while working with several detectives on

13  both sides of the river, in Bossier and in Caddo, he's got an

14  extensive history with both, both parishes.

15  Q.    You mentioned Caddo Parish.  Does Mr. Spann have a

16  current pending charge out of Caddo Parish?

17  A.    He does.

18  Q.    And was that charge pending at the time he committed the

19  instant offense?

20  A.    Yes.

21  Q.    Did he also have charges out of Bossier Parish?

22  A.    Yes.

23  Q.    And were those charges --

24             THE COURT:  But he was on bond at the time that --

25  out of state court at the time these checks were cashed?

1             THE WITNESS:  Yes, sir.

2  BY MS. FIELDS:

3  Q.    Was he also on bond for charges in Bossier Parish when

4  these checked were cashed?

5  A.    Yes.

6           MS. FIELDS:  Your Honor, I'll pass the witness.

7           THE COURT:  All right.

8                  CROSS-EXAMINATION

9  BY MS. MARAK:

10  Q.    Good afternoon, Agent Craft.

11  A.    Good afternoon.

12  Q.    I believe -- let me make sure I have this correct --

13  that -- so the check identified as Exhibit 2 and the check

14  identified as Exhibit 4 are both Postal Service account

15  numbers?

16  A.    That's correct.

17  Q.    Okay.  The check No. 1 is a different routing number and

18  a different account number?

19  A.    That's correct.

20  Q.    Who does that account number belong to?

21  A.    On -- the Government Exhibit 1 comes back to Tower Loan

22  from Trustmark Bank.

23  Q.    Okay.  So Tower Loan is actually a victim, and that is

24  their account number?

25  A.    That's correct.

1   Q.    Okay.  And so that -- those checks would have been drawn

2   on the Tower Loan account?

3   A.    That's correct.

4   Q.    Check Nos. 4 and 5, although they appear to be Tower Loan

5   checks, the U.S. Postal Service would be the victim, except

6   they charged it back to Walmart?

7   A.    That's correct, yes.

8   Q.    Are there other checks with other -- I know there are

9   other checks in this.  Are there other account numbers?  Are

10  there other victims?

11  A.    Not that I'm aware of.

12  Q.    So everything is drawn on either the Postal Service or on

13  Tower Loan?

14  A.    At this point, it would be Walmart and Tower Loan.

15  Q.    Okay.  But the account numbers belong to --

16  A.    That's correct.

17  Q.    -- the Postal Service --

18  A.    That's correct.

19  Q.    -- and Tower Loan?  All right.

20        THE COURT:  And what's the total amount of the loss

21  as far as you know today?

22        THE WITNESS:  $400,883.76.

23        THE COURT:  Four hundred thousand eight hundred and

24  what?

25        THE WITNESS:  Eighty-Three dollars and seventy-six

1    cents.

2         I can break that down into --

3              THE COURT:  No, sir.  That's fine.

4    BY MS. MARAK:

5    Q.    When was Mr. Spann arrested?

6    A.    Mr. Spann was arrested on the 6th, I believe.

7    Q.    And where was he when he was arrested?

8    A.    At Probation Office, Louisiana Probation Office.

9    Q.    From the Bossier charges?  He was reporting --

10   A.    He was reporting to his probation from the Bossier

11   charges, yes.

12   Q.    Okay.  And they were notified to detain him so that he

13   could be arrested?

14   A.    I forwarded the arrest warrant to the probation officer.

15   Q.    Has any search been done of either Mr. Spann's vehicle or

16   residence or any of those sorts of things?

17   A.    No.

18   Q.    Have any of the IDs that were used in this case been

19   recovered?

20   A.    One.

21   Q.    Okay.  And was that recovered from Mr. Spann or --

22   A.    No.

23   Q.    -- one of the other co-defendants?

24   A.    One of the other co-defendants.

25   Q.    And is that ID in any way tied to Mr. Spann or his use?

1    A.    Not his use.

2    Q.    Okay.  So you indicated, I believe, in Exhibit 1, that

3    there was an ID that was shown I guess belonging to this Adam

4    Darnell person, but we don't have an ID for that person?

5    A.    I did not say there was an ID for Adam Darnell.  I

6    believe I said Lance Willis.  He provided what was an ID.  I

7    don't know what was on the ID, because I do not have any

8    idea --

9    Q.    And that has not been recovered?

10    A.    That's right.

11    Q.    You indicated that the first check, Exhibit 1, was passed

12    in Longview?

13    A.    That's correct.

14    Q.    How many checks were passed in Longview?

15    A.    Just that one.

16    Q.    Just the one.  So the rest of them would have been passed

17    in Louisiana?

18    A.    That's correct.

19              THE COURT:  Some passed in Shreveport?

20              THE WITNESS:  Yes.

21              THE COURT:  And some in Bossier?

22              THE WITNESS:  Yes.

23    BY MS. MARAK:

24    Q.    And some in south Louisiana, too --

25    A.    That's correct.

1    Q.    -- as I understand from the indictment?

2    A.    That's correct.

3    Q.    Was Mr. Spann's cell phone seized?

4    A.    No.

5    Q.    You indicated that there were some messages from the

6    phone that was seized from Mr. Williams?

7    A.    Yes.

8    Q.    Were those messages to Mr. Spann or to someone else in

9    this indictment?

10   A.    The messages on it referred to as "Unk," from Phelix

11   Williams to Unk and Unk back to --

12   Q.    Whoever the "Unk" person might be?

13   A.    Right.

14   Q.    And you believe that person to be Mr. Spann?

15   A.    That's correct.

16   Q.    And is there a phone number associated with those

17   messages?

18   A.    There was.

19   Q.    Have you obtained those records?

20   A.    We've worked on trying to get the records.

21   Q.    You don't have them yet; is that fair?

22   A.    I don't -- that's fair.

23   Q.    Were there other numbers of other people in

24   Mr. Williams's phone associated with this conspiracy?

25   A.    Not directly talking like this, no.

1   Q.    Were any of the social security numbers that you said

2   were found in there linked to either this Adam Darnell person

3   or Lance -- the people whose identities were being used, are

4   any of the social security numbers linked to them?

5   A.    I know for a fact what was utilized for Mr. Willis did

6   come back to Mr. Willis.  So in the government exhibit, you'll

7   see that through the Thinkstream.  So I'm only able to run that

8   information because of what is generated off of that.

9   Q.    But my question is -- you said there were social security

10  numbers in the phone --

11  A.    Right.

12  Q.    -- that were being transmitted to someone else.

13  A.    Right.

14  Q.    Do any of those social security numbers link up to any of

15  these people?

16  A.    Not specifically these people.

17  Q.    Okay.

18  A.    Right.

19  Q.    And there are a total of 110 checks or 110 Tower Loan

20  checks?

21  A.    I think total, when it was all said and done, we were at

22  122 Tower Loan checks.  We had 14 Walmart checks that were

23  successfully negotiated, plus I believe there was another 18

24  attempts.  So we had 18 attempts at a Walmart where they were

25  declined.

1    Q.    And those would all be Tower Loan checks?

2    A.    Anything at Walmart would have been the Postal Service

3    account, anything at Regions Bank would have been Tower Loan

4    account, minus the one in Longview, Texas.

5    Q.    Okay.  What's the total number of checks no matter where

6    they were?

7    A.    I would say -- total negotiated checks, I'd say at 136.

8    Q.    Okay.

9          THE COURT:  What would be the reason for denial at

10   the Walmart on the 18 attempts?

11         THE WITNESS:  It could be any number of reasons.

12   Might not have -- a social security number or date of birth

13   might not have matched up with what Certegy would have had in

14   their system.  There could have been -- the information that

15   was provided to Walmart at that time when Certegy ran it

16   through the system, they might have had that person flagged as

17   a hot checks or et cetera.  So there's a number of reasons why

18   some could have been declined.

19         MS. MARAK:  That's all the questions I have.

20         THE COURT:  Ms. Fields?

21         MS. FIELDS:  Briefly, if I may, Your Honor?

22         THE COURT:  Yes.

23                     REDIRECT EXAMINATION

24   BY MS. FIELDS:

25   Q.    Agent Craft, you recall being asked some questions about

1    the Certegy system and social security numbers or

2    identification numbers --

3    A.    Yes.

4    Q.    -- that would have been used?

5          Can you briefly describe how Certegy works.

6    A.    Okay.  Certegy, obviously, is not going to be able to

7    tell whether there's enough money in an account or anything

8    like that.  So they're essentially a risk mitigation company to

9    make sure, you know, that a social security number matches up

10   with the date of birth and so forth.  So when an individual

11   comes in to pass a check, they would do that at the money

12   center.  So they would only handle like payroll checks, stuff

13   like that.

14         Then you're either going to do an enrollment for the

15   first time -- so an "enrollment" would be where you would have

16   to give your social, your name, your date of birth, other

17   identifiers.  That is input into the Certegy system.  Then

18   they'll check that out.  So if you come back again and you pass

19   a check under that same social or that same name, you do not

20   have to keep repeating that information back into the system.

21         So Certegy either has -- each time a check is passed,

22   either it shows as an enrollment or a repeat on their system.

23   Q.    And in order for a check to be passed through Certegy,

24   the identifying information that you provide at the time that

25   you pass the check has to match what's already in their system

1    if you are passing as a repeat?

2    A.    That's correct.

3    Q.    And in order for you to pass it for the first time, your

4    information would have to be valid?

5    A.    That's correct.

6    Q.    So when checks actually cleared Certegy, the social

7    security numbers, identification numbers, dates of birth would

8    have matched the person's name on the check?

9    A.    That's correct.

10             MS. FIELDS:  Thank you.

11             THE COURT:  All right.  Thank you, sir.  You can step

12   down.

13        Anything further from the Government on the detention

14   hearing?

15             MS. FIELDS:  No, Your Honor.

16             THE COURT:  Ms. Marak, anything from your side?

17             MS. MARAK:  No, Your Honor.

18             THE COURT:  The Government's motion to detain

19   Mr. Spann is granted.

20        Mr. Spann is -- his release would be a great danger to

21   the community.  He's had 21 arrests that I count so far; nine

22   felony convictions, three of which are federal felonies arising

23   out of the same type of activity.  He's been revoked four

24   times, which is a strong indication he would not abide by any

25   conditions the Court would impose.  And, in fact, some of the

1   criminal activity in this case occurred while he was on bond in

2   Caddo and Bossier Parishes.  The evidence against Mr. Spann is

3   strong, as shown by the video that we've seen earlier.  The

4   Government's motion to detain Mr. Spann is granted.

5         Mr. Spann is remanded to the custody of the Marshal

6   pending further proceedings.

7         Thank you all very much.

8         (Proceedings concluded at 2:52 p.m.)

9

10                          Certificate

11  I hereby certify this 14th day of January, 2019, that the
    foregoing is, to the best of my ability and understanding, a
12  true and correct transcript from the record of proceedings in
    the above-entitled matter.

13

14                           /s/ Marie M. Runyon_____
                             Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25

1                    **I N D E X**

2

3   <u>WITNESSES FOR THE GOVERNMENT</u>:

                                                    Re-        Re-
4                                  <u>Dir</u>   <u>Cross</u>   <u>Dir</u>    <u>Cross</u>

5        Special Agent Darren Craft.....   3      17      23       -

6

7   <u>EXHIBITS</u>:                              *Offered*   *Admitted*

8   Government Exhibit No. 1...............        5         5
    Government Exhibit No. 2...............       10        10
9   Government Exhibit No. 3...............       11        11
    Government Exhibit No. 4...............       13        13
10  Government Exhibit No. 5...............       15        16

11

12                        * * *

13

14

15

16

17

18

19

20

21

22

23

24

25